# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 52406

TAMBER SPEARS, individually, and in her
capacity as Administrator of the ESTATE OF
DAVID M. FLAGET; SHANNON FLAGET
HALL, an individual; CHRISTINE WAGNER,
an individual; BRIAN RANDALL, an
individual; PATRICK LEACH, an individual;
OLY MORRIS, an individual; BRITTNEY
CORNWELL, an individual; KENDY
FREEMAN, an individual; and COLLEEN
CARR, an individual,

    Plaintiffs-Appellants,

v.

ANTELOPE MOUNTAIN RESORT, LLC, an
Idaho limited liability company; JAMES D.
RUSSELL, an individual; MARY
KATHERINE RUSSELL, an individual,

    Defendants-Respondents,

and,

ELIZABETH RUSSELL, an individual;
ROBERT DAVID RUSSELL and LIANN
RUSSELL, husband and wife,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, January 2026 Term

Opinion Filed: February 27, 2026

Melanie Gagnepain, Clerk

Appeal from the District Court of the First Judicial District of the State of Idaho, Bonner County. Lamont Berecz, District Judge.

The decision of the district court is affirmed.

Riverside NW Law Group, PLLC, Spokane, Washington, for Appellants. Max K. Archer, argued.

Paine Hamblen, LLP, Spokane, Washington, for Respondent James D. Russell.

1

Anderson Julian & Hull, LLP, Boise, for Respondents Antelope Mountain Resort, LLC, Mary Katherine Russell, and Elizabeth Russell. Robert A. Mills, argued.

Cooper & Larsen, Chartered, Pocatello, for Respondents Lianna Russell and Robert David Russell.

———————————

BRODY, Justice.

This appeal addresses whether Mary Katherine Russell and her limited liability company, Antelope Mountain Resort, LLC ("AMR") (collectively, "Mary Russell" or "Mary"), may be held civilly liable for the criminal act of her grandson, James D. Russell. Mary Russell permitted James Russell to reside on property she owns in Clark Fork, Idaho. In September 2021, James Russell— apparently suffering from severe mental illness—perceived Mary Russell's groundskeeper, David Flaget, to be a trespasser. James Russell beat Flaget to death and consumed portions of Flaget's remains. James pleaded guilty to second-degree murder and was sentenced to life in prison.

Flaget's heirs brought this action against Mary Russell, seeking to hold her liable for Flaget's death. The claims at issue on appeal are: (1) wrongful death; (2) intentional infliction of emotional distress ("IIED"); and (3) negligent infliction of emotional distress ("NIED"). The district court granted summary judgment in Mary Russell's favor, concluding that Mary Russell did not owe a duty to aid or protect Flaget from James Russell under either a special relationship theory or an assumed duty theory. The district court also determined that the Flaget heirs' claims for IIED failed as a matter of law because they failed to allege any tortious conduct directed at the heirs themselves and that their NIED claims failed because Mary Russell owed no duty to the heirs. For the reasons explained below, we affirm the district court's decision.

## I.    FACTUAL AND PROCEDURAL HISTORY

Prior to the events at issue in this case, the record indicates that James Russell had been diagnosed with bipolar schizoaffective disorder. The complaint alleges that "at some point in his late-20s / early-30s, James suffered a traumatic brain injury . . . during a martial arts competition," which "left him with long-term brain damage." The complaint further alleges that James was "prescribed medication for acute psychosis, schizophrenia, and bipolar disorder" in 2017. And it notes at least three prior instances in which James acted violently: (1) an attack on two other groundskeepers on Russell family property in Montana in November 2020; (2) an attack on his father and four responding police officers in December 2020; and (3) a brutal attack on a cellmate

in jail shortly thereafter. After the incident in Montana, James Russell moved to Mary Russell's fifty-seven-acre property in Clark Fork, Idaho, during the summer of 2021. The property is owned in part by Mary Russell and in part by AMR. James resided in a "Garage Loft Apartment" on the property and "c[a]me and [went] as he pleased."

Mary Russell periodically hired Flaget to perform maintenance work on the Clark Fork property and to serve generally as its caretaker. Flaget set his own hours, and Mary Russell did not supervise how he completed his groundskeeping duties. One morning in September 2021, Flaget was performing maintenance work on the property when James Russell perceived him to be a trespasser. James murdered Flaget and "mutilated and ate [his] corpse." Elizabeth Russell, James' aunt who was also living on the Clark Fork property, discovered the remains of Flaget's body stuffed inside Flaget's truck. James was charged with first-degree murder and cannibalism. *See* I.C. §§ 18-4003(d), 18-5003(1). James later pleaded guilty to second-degree murder and was sentenced to life in prison.

Flaget's surviving family members brought this action against Defendants James Russell, Mary Russell, Elizabeth Russell, Robert David Russell (James' father), and Liann Russell (James' mother) (collectively, "the Russell defendants"). The Flaget heirs brought six claims against the Russell defendants: (1) wrongful death—negligence, recklessness, wanton, and willful; (2) wrongful death—premises liability; (3) IIED; (4) NIED; (5) mishandling of a body; and (6) loss of society and companionship. The district court dismissed the Flaget heirs' claims against Robert and Liann for lack of personal jurisdiction.

Mary and Elizabeth Russell moved for summary judgment, arguing that they were not "liable for their adult grandson's / nephew's wrongful acts against David Flaget" and, therefore, they were entitled to judgment as a matter of law on all the Flaget heirs' claims. The Flaget heirs offered two declarations in opposition to summary judgment. The first of these came from Oly Morris, Flaget's son. Morris' declaration recounted two instances in which Flaget reported troubling interactions he had with James on the Clark Fork property. Morris also recalled Mary offering him money to avoid a lawsuit in the aftermath of Flaget's death. The second declaration consisted of statements from Mary Russell's former housekeeper, Jacqueline Smith. Smith's declaration recounted two interactions with James Russell in which he "snapped" at her and acted aggressively. She also relayed a conversation she had with Flaget about James Russell's aggressive behavior.

Mary and Elizabeth Russell moved to strike portions of the declarations as inadmissible under Idaho Rule of Civil Procedure 56(c)(4). The district court sustained some of the objections and overruled others. Ultimately, the district court granted Mary and Elizabeth Russell's motion for summary judgment, ruling that they owed no duty to protect Flaget from James Russell. The Flaget heirs argued that such a duty arose from a "special relationship" between Mary and Flaget based on his employment as the Clark Fork property's groundskeeper. The district court rejected this argument, reasoning that Mary, as Flaget's employer, did not exercise "full custody and control" over him such that a duty to keep him safe would arise.

In the alternative, the Flaget heirs argued that Mary "assumed an affirmative duty" to protect Flaget "by 'attempting to control [James] and mediate his disputes with . . . Flaget.'" Specifically, the Flaget heirs point to two instances in which Mary Russell "intervened in . . . verbal conflicts between . . . Flaget and James Russell over the summer." They framed these interactions as a voluntary undertaking giving rise to a legal duty on Mary Russell's part to protect Flaget from James Russell. The district court rejected this theory of duty as well, ruling that the record did not demonstrate Mary Russell undertook to physically protect Flaget from James Russell:

> There remains no fact in the record that . . . Flaget relied on Mary Russell for ongoing physical protection from harm. Likewise, as discussed above, there is no foreseeability that Mary's failure to keep protecting Mr. Flaget—by no longer interceding in his verbal disputes with James Russell—would lead to violence or to the murder of Mr. Flaget.

With respect to the Flaget heirs' IIED claim, the district court concluded they failed to show "extreme and outrageous" conduct by Mary Russell—conduct "that the average person would deem atrocious, or conduct beyond all possible bounds of human decency." The court also ruled that the Flaget heirs had not demonstrated Mary Russell intentionally directed tortious conduct toward them personally.

The district court dismissed the Flaget heirs' NIED claim for similar reasons. Because the Flaget heirs failed to demonstrate that Mary Russell personally owed them a duty, they could not establish the first element of an NIED claim. The district court also dismissed the Flaget heirs' premises liability claim, reasoning that the underlying tortious conduct—James' attack—involved an activity rather than a physical condition of the property that would be cognizable under a premises liability theory. On appeal, the Flaget heirs timely challenge the district court's grant of summary judgment in favor of Mary Russell on their negligence, IIED, and NIED claims. They

4

do not appeal the grant of summary judgment on the premises liability claim, nor do they challenge the dismissal of the claims against Elizabeth Russell.

## II.    STANDARDS OF REVIEW

Summary judgment is a procedural device designed "to expedite the determination of actions on their merits and eliminate sham claims or defenses without the necessity of a full trial." 10A Wright & Miller's Federal Practice & Procedure § 2711 (4th ed. 2025). In that spirit, Rule 56 of the Idaho Rules of Civil Procedure allows for an award of summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." I.R.C.P. 56(a). "When considering whether the evidence shows a genuine issue of material fact, the trial court must liberally construe the facts, and draw all reasonable inferences in favor of the nonmoving party." *Fragnella v. Petrovich*, 153 Idaho 266, 271, 281 P.3d 103, 108 (2012) (citation omitted). To establish that a genuine dispute of material fact exists, a party must present evidence upon which a jury could reasonably rely; a "scintilla of evidence merely casting a slight doubt of the facts" will not suffice. *Id.* (citation omitted).

"This Court reviews appeals from an order of summary judgment *de novo*, and the 'standard of review is the same as the standard used by the trial court in ruling on a motion for summary judgment.'" *Stonebrook Constr., LLC v. Chase Home Fin., LLC*, 152 Idaho 927, 929, 277 P.3d 374, 376 (2012) (quoting *Curlee v. Kootenai Cnty. Fire & Rescue*, 148 Idaho 391, 394, 224 P.3d 458, 461 (2008)). Accordingly, where there is no genuine dispute as to any material fact and only questions of law remain, this Court will exercise free review over those questions. *Id.* at 930, 277 P.3d at 377.

## III.    ANALYSIS

### A. The Flaget heirs waived their challenge to the district court's evidentiary rulings on the Morris and Smith declarations.

In opposition to Mary Russell's motion for summary judgment, the Flaget heirs submitted declarations from Morris and Smith in an effort to create a genuine dispute regarding Mary Russell's knowledge of James Russell's propensity for violence. Mary Russell moved to strike various portions of the declarations, and the district court granted the motion in part as to specific statements in each declaration. On appeal, the Flaget heirs contend that the district court abused its discretion in striking portions of the declarations. However, we decline to address the merits of this claim because the Flaget heirs' opening brief advances no argument on the issue.

In an appeal before this Court, the opening brief must "contain the contentions of the appellant with respect to the issues presented on appeal, the reasons therefor, with citations to the authorities, statutes and parts of the transcript and record relied upon." I.A.R. 35(a)(6). When a party fails to heed Rule 35's directive by presenting an issue on appeal that is unsupported by argument or authority, this Court treats the issue as waived and declines to consider it. *Anson v. Les Bois Race Track, Inc.*, 130 Idaho 303, 304, 939 P.2d 1382, 1383 (1997) (quoting *State v. Zichko*, 129 Idaho 259, 263, 923 P.2d 966, 970 (1996)). The absence of either argument or authority will suffice for this Court to treat the underlying issue as waived. *Id.* (quoting *Zichko*, 129 Idaho at 263, 923 P.2d at 970). More specifically, when an appellant asserts that the district court abused its discretion, the appellant bears the burden of advancing a meaningful argument applying the four *Lunneborg* factors this Court uses to evaluate such claims. *Cummings v. Stephens*, 160 Idaho 847, 853, 380 P.3d 168, 174 (2016); *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018).

The Flaget heirs have not carried this burden. Their briefing offers no argument that the district court abused its discretion in striking portions of the Morris and Smith declarations. Although they identify this issue in their opening brief—stating that one question on appeal is "[w]hether the Bonner County District Court erred when it struck portions of the Declarations of Jacqueline Smith and Oly Morris"—they do no more than recite *Lunneborg*'s abuse of discretion test. The Flaget heirs never apply that standard to the district court's ruling beyond the conclusory assertion that the district court "erred by striking certain admissible portions" of the Smith and Morris declarations.

Our adversarial system of adjudication relies on the parties to advance arguments articulating the reasons why they are entitled to relief. *Herr v. Herr*, 169 Idaho 400, 404, 496 P.3d 886, 890 (2021) (quoting *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020)). Because the Flaget heirs have provided neither authority nor substantive analysis to support their contention that the district court abused its discretion, we decline to address the issue.

**B. The district court properly granted summary judgment for Mary Russell on the Flaget heirs' wrongful death claim because she had no duty to aid or protect David Flaget.**

Turning to the merits, the Flaget heirs argue that the district court erred in concluding, as a matter of law, that Mary Russell owed Flaget no duty of care under either a special-relationship or

assumed-duty theory. Reviewing the question of duty de novo, we find the Flaget heirs' arguments unpersuasive and affirm the district court's decision.

Tortious conduct is a prerequisite to a wrongful death action. That is, the decedent's heirs or personal representatives must establish that the defendant owed the decedent a duty of care, and that the defendant's breach of that duty proximately caused the decedent's death. *See Castorena v. Gen. Elec.*, 149 Idaho 609, 619, 238 P.3d 209, 219 (2010); *see also* I.C. § 5-311(1) ("When the death of a person is caused by the wrongful act or neglect of another, his or her heirs or personal representatives on their behalf may maintain an action for damages against the person causing the death . . . ."). The focus of this appeal is on the first element of negligence: duty.

The Flaget heirs advance two theories under which Mary Russell owed Flaget a duty of care. First, they argue that Mary Russell's employment of Flaget created a special relationship imposing on her a duty to protect Flaget from James Russell. Second, they contend that Mary Russell voluntarily assumed this duty through her efforts to "control [James] and mediate his disputes with . . . Flaget." The district court rejected both theories, concluding neither established a duty of care. We agree. Neither Mary Russell's employment of Flaget nor her attempts to mediate the ongoing interpersonal conflict between Flaget and James Russell suffice to support a special-relationship or assumed-duty theory.

*1. The district court correctly rejected the Flaget heirs' special relationship theory.*

The Flaget heirs argue that the district court erred in concluding Flaget's employment relationship with Mary Russell did not give rise to a "special relationship" imposing a duty on her to protect Flaget from James Russell. They fault the district court for ignoring: (1) "facts in the record that the [Clark Fork property] was in an isolated location," (2) that Flaget "relied upon Mary Russell for all onsite equipment," and (3) "Mary['s] prior knowledge that [James] was a dangerous individual who had already attacked groundskeepers in the past."

Mary Russell disagrees. Relying on *Schriver v. Raptosh*, 174 Idaho 498, 509, 557 P.3d 398, 409 (2024), Mary Russell counters that the district court's conclusion was entirely consonant with Idaho tort law because there is no evidence tending to show that she exercised "custody and control" over Flaget, the "hallmarks" of a special relationship. We agree that the record does not demonstrate the hallmarks of a special relationship.

As a general rule, Idaho law does not impose an affirmative duty to "assist or protect another absent unusual circumstances." *Coghlan v. Beta Theta Pi Fraternity*, 133 Idaho 388, 399,

987 P.2d 300, 311 (1999) (citing Restatement (Second) of Torts § 314A (1965)). The existence of a "special relationship" may constitute such an unusual circumstance, giving rise to a duty to protect. *Id.* For tort-law purposes, Idaho recognizes two categories of special relationships. The first "exists between the actor and a third person which imposes a duty upon the actor to control the third person's conduct[.]" *Turpen v. Granieri*, 133 Idaho 244, 248, 985 P.2d 669, 673 (1999) (quoting Restatement (Second) Torts § 315 (1965)). This Court has identified examples of these relationships, including "a parent's duty to control his child, an employer's duty to control an employee while at work, or a law enforcement officer's duty to control a dangerous prisoner." *Henrie v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, 162 Idaho 204, 209, 395 P.3d 824, 829 (2017) (quoting *Turpen*, 133 Idaho at 248, 985 P.2d at 673). These examples underscore that the "quintessential aspects" of this category are "custody and control" over the third person—attributes that give rise to a duty to protect others from the third person's tortious conduct. *GSN Cap., LLC v. Shoshone City & Rural Fire Dist.*, 173 Idaho 345, 356, 541 P.3d 703, 714 (2024); *Litchfield v. Nelson*, 122 Idaho 416, 420–21, 835 P.2d 651, 655–56 (Ct. App. 1992) ("For there to be a special relationship between the actor and the third person, the actor must have the ability and obligation to control the conduct of the third person.").

The second category of a special relationship "exists between the actor and the other which gives the other a right to protection." *Turpen*, 133 Idaho at 248, 985 P.2d at 673 (quoting Restatement (Second) Torts § 315 (1965)). Like the first category, the duty to protect is imposed on the "actor" who exercises custody and control over the "other." *See GSN Cap.*, 173 Idaho at 356, 541 P.3d at 714. In the employment context, this duty may arise when the nature of the employment requires the employee to "entrust[] himself to the control and protection of [the employer], with a consequent loss of control to protect himself." *Williams v. Cunningham Drug Stores, Inc.*, 418 N.W.2d 381, 383 (Mich. 1988). When that is the case, "[t]he duty to protect is imposed upon the person in control because he is best able to provide a place of safety." *Id.* In this case, the district court aptly pointed to miners, divers, and flight attendants as examples of professions where a special relationship is part and parcel of the employment relationship given that these professionals "must rely on his or her employer for safety." The court aptly noted: "For example, flight attendants must entrust themselves to the airline for which they work, presuming the airplane will be maintained properly for safe travel. While they are working, the airline has full custody and control of the attendants." Under either category of special relationship, the analysis

8

begins by considering whether the custody and control elements are present. *GSN Cap.*, 173 Idaho at 354, 356, 541 P.3d at 712, 714. If those elements are satisfied, a special relationship exists.

In the present case, the Flaget heirs argue that Mary Russell owed a duty to protect David Flaget from James Russell under the second category of special relationship—her alleged custody and control over Flaget as her groundskeeper. Although it is undisputed that Mary Russell employed Flaget as a groundskeeper, the pertinent question is whether she simultaneously exercised "full custody and control" over him such that Flaget relied on her for his personal safety. *See id.* at 356, 541 P.3d at 714. To support their position, the Flaget heirs invoke agency-law principles, asserting that Mary Russell "controlled" Flaget's groundskeeping work. But even if true, that point is immaterial to the existence of a special relationship. As discussed, the relevant inquiry is whether the "other" (Flaget) was deprived of personal autonomy to the extent that he was compelled to rely on his employer (Mary Russell) for safety. *See Turpen*, 133 Idaho at 248, 985 P.2d at 673 (quoting Restatement (Second) Torts § 315 (1965)); *GSN Cap.*, 173 Idaho at 356, 541 P.3d at 714.

The Flaget heirs attempt to equate control over Flaget's *work* with "custody and control" over his *person*, arguing that because Mary Russell directed his tasks, he must also have depended on her for protection. Their reasoning is flawed. The agency principle of control is unrelated to the tort principle of a special relationship based on custody and control. In other words, an employer who controls his employee's work does not necessarily exercise custody and control over the employee's person; these are separate inquiries. The nature of Flaget's duties as a groundskeeper did not entail a loss of his ability to ensure his own safety. True, Mary Russell may have been Flaget's supervisor, but she did not exercise *custody* over Flaget in the way, for example, an airline does over a flight attendant. Flaget freely entered and exited the property, and he performed the tasks Mary Russell did assign him with minimal supervision. Put simply, Mary Russell was not Flaget's custodian while he worked on the Clark Fork property. It follows that Flaget did not rely on her for protection, and Mary Russell had no duty to provide it. In the absence of this "hallmark" of a special relationship, the district court correctly concluded that Mary Russell owed no duty to protect Flaget by virtue of their employment relationship.

Nonetheless, the Flaget heirs insist the district court erred in reaching this conclusion because it failed to consider that the Clark Fork property "was in an isolated location, that Mr. Flaget relied upon Mary Russell for all onsite equipment, and Mary['s] prior knowledge that

9

[James] was a dangerous individual who had already attacked groundskeepers in the past." These concerns, however legitimate, have no bearing on whether Mary Russell exercised custody and control over Flaget. First, as mentioned, there is no indication that, once Flaget entered the Clark Fork property to perform his work, he became cut off from the outside world and lost autonomy over his person, including an ability to protect himself.

Next, the fact that Mary Russell provided Flaget with groundskeeping tools may be relevant to the degree of control she exercised over his work as a matter of agency law, but it says nothing about whether she physically exercised custody over his person. Again, this line of reasoning reflects the Flaget heirs' mistaken attempt to equate agency-based control with the "custody and control" required to establish a special relationship under tort law. The two are distinct and different concepts.

Finally, the Flaget heirs point to Mary Russell's knowledge of James' past violent behavior as a relevant factor in the custody-and-control analysis, which the district court declined to consider. Yet Mary Russell's knowledge of the risk James Russell may have posed says nothing about whether her employment relationship with Flaget required that he "entrust[] himself to [her] control and protection . . . , with a consequent loss of control to protect himself." *Williams*, 418 N.W.2d at 383. And as a more general matter, knowledge of a danger, standing alone, does not give rise to a duty to provide aid or protection. Restatement (Second) Torts § 314 (1965); *Coghlan*, 133 Idaho at 400, 987 P.2d at 312 (declining to impose a duty on university to protect adult students from risks of voluntary intoxication, even where university personnel were aware of widespread alcohol use); *accord Harper v. Herman*, 499 N.W.2d 472, 475 (Minn. 1993) (declining to hold a boat pilot liable for injuries to a passenger who dove into shallow water despite the pilot's knowledge of the depth).

In sum, the employment relationship between Mary Russell and Flaget does not reflect the degree of custody and control "quintessential" to a special relationship from which a duty to aid or protect may arise. *See GSN Cap.*, 173 Idaho at 356, 541 P.3d at 714. Flaget never surrendered his personal autonomy as a condition of employment as Mary Russell's groundskeeper, so she had no duty to provide aid or protection in that capacity. The Flaget heirs' arguments to the contrary are irrelevant to the custody-and-control inquiry and conflict with longstanding limiting principles on the duty to aid or protect embraced by this Court. We conclude that the district court correctly

10

ruled Mary Russell owed no duty to protect Flaget from James Russell's violence under a special-relationship theory.

      2.   *The district court correctly rejected the Flaget heirs' assumed-duty theory.*

The Flaget heirs advance a second theory to support their claim that Mary Russell owed a duty to aid or protect Flaget. They argue that Mary Russell voluntarily assumed this duty when she intervened in at least two prior "disputes" between Flaget and James Russell during the course of Flaget's groundskeeping work on the Clark Fork property.

The first incident occurred when James Russell arrived at the property in the summer of 2021. In her deposition, Mary Russell explained that James boarded in various locations on the property, a pattern that vexed Flaget and led to tension between the two men:

> [Mary Russell]. That was one of the problems that our caretaker was having with [James] because he wanted to move from house to house because there's several buildings up there that are made up and ready to use. And he wanted to stay where he wanted to stay. And that was where -- a point of -- of dispute between [James] and my caretaker because [James] was going from house to house.
>
> . . . .
>
> . . . [Flaget] just told me that [James] just wanted to go from place to place, and he said he got tired of cleaning up after him every -- he'd be one place one day, and couple days later, he was someplace else. And he said I'm tired of this.
>
> . . . .
>
> Q. Did you talk to James about staying in one place?
>
> [Mary Russell]. Yes, I did.
>
> Q. What do you remember about that conversation with James?
>
> [Mary Russell]. Well, it was just that. I said, [James], you've got to decide where you're going to stay. You can stay here, but you can't just keep -- keep moving from place to place.
>
> Q. Did James then stay in one place after that conversation?
>
> [Mary Russell]. Well, pretty much, I guess.

The second incident involved James' attempts to micromanage Flaget's work:

> [Mary Russell]. Because James was -- wanted to boss -- boss every -- boss and be -- tell [Flaget] what to do. He saw it wasn't going to work.
>
> . . . .
>
> Q. Did [Flaget] tell you that those two had a lot of interactions with like --

[Mary Russell]. No, he didn't mention it was a lot. But he said I'm not -- he said I want you to know I'm not taking orders from [James]. And I said I don't expect you to.

. . . .

Q. Okay. And what did -- do you remember what exactly you said to James?

[Mary Russell]. Well, I said, James, just mind your business and let [Flaget] mind his. I said you're welcome here, but you just -- just keep out of my caretaker's business. He knows what he's doing.

Q. Did James -- after that conversation you had with James, did James stop what he was doing with regards to [Flaget]?

[Mary Russell]. Not really. He doesn't listen -- he never listened to anybody.

The district court concluded that, although Mary Russell may have intervened to some extent in these disagreements, those "sparse facts" were insufficient to establish that she thereby assumed a duty to protect Flaget from James Russell's subsequent criminal violence. On appeal, the Flaget heirs argue that the district court erred in reaching this conclusion because it "emphasized Mary Russell's age, characterizing her as an 'elderly woman' and minimizing her role as an employer who actively intervened in escalating confrontation between her grandson, James Russell, and her employee." They contend that, by "directing James to stay in one cabin and later instructing him to follow Mr. Flaget's orders," Mary Russell voluntarily assumed a duty, not to "physically restrain her grandson," but to warn Flaget of James Russell's violent history, to "ensure[] the two were not present on the property simultaneously, or [to] temporarily suspend[] Mr. Flaget's duties while James was in residence." The Flaget heirs' attempt to locate an assumed duty on Mary Russell's part in these limited interactions is unavailing.

Apart from the existence of a special relationship, an affirmative duty to protect another may also arise "[i]f one voluntarily undertakes to perform an act, having no prior duty to do so." *Featherston ex rel. Featherston v. Allstate Ins. Co.*, 125 Idaho 840, 843, 875 P.2d 937, 940 (1994). In that instance, "the duty is to perform the voluntarily undertaken act in a non-negligent manner." *Baccus v. AmeriPride Servs., Inc.*, 145 Idaho 346, 350, 179 P.3d 309, 313 (2008) (citation modified). Importantly, however, "[l]iability for an assumed duty . . . can only come into being to the extent that there is in fact an undertaking." *Udy v. Custer County*, 136 Idaho 386, 389, 34 P.3d 1069, 1072 (2001) (citation omitted). And the scope of the duty is coterminous with the undertaking itself. *Baccus*, 145 Idaho at 350, 179 P.3d at 313. That is, the actor incurs no obligation beyond the duty actually assumed. *Id.* Moreover, "past voluntary acts do not entitle the benefited

party to expect assistance on future occasions, at least in the absence of an express promise that future assistance will be forthcoming." *Udy*, 136 Idaho at 390, 34 P.3d at 1073 (first citing *City of Santee v. County of San Diego*, 259 Cal. Rptr. 757, 762 (Ct. App. 1989); and then citing *Fort Bend Cnty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 397 (Tex. 1991)).

We follow a three-element test for establishing a voluntarily assumed duty: "(1) one previously has undertaken to perform a voluntary undertaking; (2) others are relying on the continued performance of the service; and (3) it is reasonably foreseeable that legally recognized harm could result from failure to perform the undertaking." *GSN Cap.*, 173 Idaho at 357, 541 P.3d at 715 (citation modified); *Forbush v. Sagecrest Multi Fam. Prop. Owners' Ass'n, Inc.*, 162 Idaho 317, 326, 396 P.3d 1199, 1208 (2017); *Beers v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, 155 Idaho 680, 688, 316 P.3d 92, 100 (2013). Applying this test, we conclude that the district court correctly ruled as a matter of law that Mary Russell owed no duty to aid or protect Flaget from James Russell.

As to the first element, there is little dispute that Mary Russell to some degree voluntarily undertook to mediate at least two disagreements between Flaget and James Russell. The question, however, is whether Mary's verbal instructions to James Russell—directing him to stay in one location in one instance and not to interfere with Flaget's work in another—constituted a "voluntary undertaking" from which a specific legal duty to aid or protect Flaget could arise. While her instructions may have been intended to assist Flaget in performing his groundskeeping duties without disruption, they are not reasonably congruent with a duty to protect Flaget from James Russell's criminal violence. *See Baccus*, 145 Idaho at 350, 179 P.3d at 313. In other words, a duty to aid or protect against criminal violence cannot be assumed based on conduct that is, at most, intended to facilitate Flaget's completion of his work without hindrance.

Moreover, Mary's limited interventions amount only to prior voluntary acts; nothing in the record indicates that Mary expressly promised Flaget that she would continue to mediate disputes between the two as Flaget continued his work on the property—let alone that she would guarantee Flaget's personal safety from criminal violence in the course of employment. On these facts, the first element of an assumed duty is not satisfied.

Relatedly, the record does not support a finding that Flaget relied on Mary Russell for protection. The district court treated as undisputed that Flaget set his own schedule, independently determined how he would complete his work, and was not instructed on occupational safety

measures or offered security as part of his employment. The record generally shows that Flaget worked independently, largely free of regular supervision. Based on these facts, it is difficult to conclude that Flaget relied on Mary Russell to provide protection from James Russell or anyone else on an ongoing basis. The two occasions in which Mary Russell instructed James to remain in one place and to refrain from meddling in Flaget's work do not change this conclusion. Thus, the Flaget heirs have not met the second element of an assumed duty.

Finally, when Mary Russell's actual undertaking—verbally mediating two disagreements—is properly defined, it becomes clear that her failure to continue those efforts would not foreseeably result in "legally recognized harm" to Flaget. At most, her failure to mediate any future disagreements may have resulted in worsening relations between the two men; it is not reasonably foreseeable that it would result in Flaget's death. The third element of an assumed-duty theory is therefore not met.

In sum, the only undertaking Mary Russell ever made was to verbally mediate relatively minor disagreements between Flaget and James Russell. The Flaget heirs seek to ascribe a different undertaking—an ongoing guarantee of physical protection—to Mary Russell. Our assumed-duty doctrine does not permit such a transformation of the actual undertaking. Accordingly, we conclude that Mary Russell never assumed a duty to aid or protect Flaget from James Russell. The district court did not err in reaching this conclusion as a matter of law.

Because both theories of duty advanced by the Flaget heirs fail as a matter of law, we affirm the district court's grant of summary judgment in favor of Mary Russell on the negligence claim brought under the wrongful death statute.

**C. The district court properly granted summary judgment in favor of Mary Russell on the Flaget heirs' claim for IIED because Mary Russell's conduct was not extreme and outrageous or intentionally directed at them.**

The Flaget heirs also asserted a claim for IIED against Mary Russell, alleging that she "intentionally or recklessly breached [her] duty of care in an extreme and outrageous manner, thereby inflicting severe emotional distress [on them]." Specifically, the Flaget heirs charge Mary Russell with failing "to warn David Flaget that he was having numerous confrontations with a man who had already violently attacked [previous] groundskeepers after the same kind of confrontations," referring to James Russell's earlier attack on the Russells' groundskeepers in Montana. The district court granted summary judgment to Mary Russell on this claim on two independent grounds.

14

First, the district court ruled that the Flaget heirs failed as a matter of law to demonstrate Mary Russell's conduct met the "extraordinarily high threshold" of extreme and outrageous behavior—conduct "the average person would deem atrocious, or conduct beyond all possible bounds of human decency." Second, the district court ruled that the Flaget heirs "fail[ed] to identify any duty owed to them or any conduct directed toward them as third parties by Mary Russell that could comprise the tort of [IIED]." For the reasons that follow, we agree with both rationales.

The tort of IIED recognizes an individual's "interest in peace of mind as entitled to independent legal protection . . . against intentional invasions." W. Page Keeton et al., Prosser & Keeton on Torts § 12, at 54–55 (5th ed. 1984). An IIED claimant must show four elements: "(1) the conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe." *Hopper v. Swinnerton*, 155 Idaho 801, 810, 317 P.3d 698, 707 (2013) (citation omitted).

Addressing the Flaget heirs' IIED claim, the district court first considered whether Mary Russell's conduct was "extreme and outrageous." Although somewhat nebulous, this standard is intended to limit IIED claims to conduct "especially calculated to cause serious mental and emotional disturbance," thereby "provid[ing] the necessary assurance that genuine harm has been done." William L. Prosser, *Intentional Infliction of Mental Suffering: A New Tort*, 37 Mich. L. Rev. 874, 879 (1939). It does not extend to conduct that is merely "unjustifiable," but instead requires conduct that exceeds "all possible bounds of decency." *Edmondson v. Shearer Lumber Prods.*, 139 Idaho 172, 180, 75 P.3d 733, 741 (2003) (citation omitted). When reasonable minds may differ as to whether the conduct at issue in a particular case is extreme and outrageous, that question is reserved to the finder of fact. *Id.* (citing Restatement (Second) of Torts § 46 cmt. h (1965)). But when the conduct "could not reasonably be regarded as so extreme and outrageous as to permit recovery for intentional or reckless infliction of emotional distress," the issue is properly adjudicated by the trial court as a matter of law at the summary judgment stage. *Id.*

Here, the district court concluded that the Flaget heirs had not met the "extraordinarily high threshold" of showing that Mary Russell's failure to warn or otherwise protect Flaget amounted to "extreme and outrageous" conduct. We agree. The Flaget heirs do not contend that Mary engaged in affirmative, intentionally tortious conduct; rather, they argue that she intentionally refrained from acting—specifically, she failed to warn Flaget of the danger James Russell posed. This kind

15

of nonfeasance does not fall within the ambit of the "extreme and outrageous" standard. *Cf. Gray v. Schenectady City Sch. Dist.*, 927 N.Y.S.2d 442, 445 (App. Div. 2011) (holding employer-defendant's "mere inaction after receiving complaints about [employee's] behavior" does not rise to "extreme and outrageous" behavior); *Roberts v. Circuit-Wise, Inc.*, 142 F. Supp. 2d 211, 218 (D. Conn. 2001) (applying Connecticut law in ruling that employer-defendant's failure to prevent employee's harassment of plaintiff does not rise to the level of "extreme and outrageous conduct"); *Burrow ex rel. Burrow v. Postville Cmty. Sch. Dist.*, 929 F. Supp. 1193, 1210 (N.D. Iowa 1996) (applying Iowa law in ruling that defendant-school district's "passive negligence" in failing to protect plaintiff-student from peers' harassment does not rise to the level of conduct "so outrageous . . . and so extreme in degree").

The district court also determined the IIED claim failed as a matter of law because the record did not show any intentional conduct directed at the Flaget heirs themselves. It determined that Mary Russell neither knew the Flaget heirs personally nor interacted with them, apart from "occasionally meeting Oly Morris." A tort is intentional when the tortfeasor "desires to cause [the] consequences of his act" or when "he believes that the consequences are substantially certain to result from it." Restatement (Second) of Torts § 8A (1965). Critically, intentionality in tort law means the actor intends those consequences to affect the plaintiff specifically. *Christensen v. Super. Ct. of Los Angeles Cnty.*, 820 P.2d 181, 202–04 (Cal. 1991) (collecting cases) ("It is not enough that the conduct be intentional and outrageous. It must be conduct directed at the plaintiff . . . ."); *see also Hopper*, 155 Idaho at 810, 317 P.3d at 707 (affirming summary judgment on IIED claim because, inter alia, "no respondent acted intentionally towards [appellant] or his wife"); *Alderson v. Bonner*, 142 Idaho 733, 740–41, 132 P.3d 1261, 1268–69 (Ct. App. 2006) (affirming summary judgment on IIED claim because defendant-voyeur videotaped plaintiff's roommate in her bedroom, not plaintiff). Absent conduct specifically directed at the plaintiff, an IIED claim fails on the element of intent.

Nothing in the record supports the contention that Mary Russell directed the consequences of her alleged nonfeasance—her failure to protect Flaget—toward the Flaget heirs personally. Put differently, the Flaget heirs have offered no evidence showing that Mary Russell intended to cause *them* emotional distress by refraining from warning, aiding, or protecting Flaget from James Russell. Indeed, the district court found, based on the evidence in the record, that Mary Russell had no relationship with the Flaget heirs, and we see no reason to disturb that finding on appeal.

Accordingly, there is no basis to conclude that Mary Russell acted intentionally towards the Flaget heirs.

The Flaget heirs have failed to show that Mary Russell acted intentionally toward them, or that her conduct constituted extreme and outrageous behavior, both of which are necessary elements of an IIED claim. We therefore affirm the district court's grant of summary judgment in favor of Mary Russell on the Flaget heirs' IIED claim.

**D. The district court properly granted summary judgment in favor of Mary Russell on the Flaget heirs' claim for NIED because Mary Russell owed no duty to them.**

The Flaget heirs brought an additional claim against Mary Russell for emotional distress based on a negligence theory. They alleged that Mary Russell owed a duty of care to Flaget and that Mary Russell breached that duty by failing to (1) "warn and protect" Flaget from "the risk posed by James;" (2) reasonably supervise James; (3) ensure James was taking his medication and receiving medical care; (4) permitting James to board on the Clark Fork property; and (5) failing to take "other reasonable measures." The breach of this duty is alleged to have caused the Flaget heirs "to suffer severe, physically manifested emotional distress."

Like IIED, NIED protects an individual's interest in "peace of mind," but does so against negligent rather than intentional conduct. *See* W. Page Keeton et al., Prosser & Keeton on Torts § 12, at 54–55 (5th ed. 1984). An NIED claim therefore requires the breach of a recognized legal duty, as in any negligence action. *Schriver v. Raptosh*, 174 Idaho 498, 508, 557 P.3d 398, 408 (2024). To prevail, a plaintiff must establish: "(1) a legal duty recognized by law; (2) a breach of that duty; (3) a causal connection between the defendant's conduct and the plaintiff's injury; and (4) actual loss or damage." *Id.* (quoting *Frogley v. Meridian Joint Sch. Dist. No. 2*, 155 Idaho 558, 569, 314 P.3d 613, 624 (2013)).

Even assuming the truth of the five breaches the Flaget heirs allege to support their NIED claim, none implicates a duty owed personally to them—only to Flaget. We have already determined that Mary Russell owed no duty to Flaget, meaning there is no independent legal duty to support an NIED claim against her. *See Nation v. State, Dep't of Corr.*, 144 Idaho 177, 191, 158 P.3d 953, 967 (2007). More fundamentally, even if Mary Russell had owed a duty to Flaget, the Flaget heirs cannot step into his shoes to recover for whatever emotional harm he may have suffered. *Vulk v. Haley*, 112 Idaho 855, 859, 736 P.2d 1309, 1313 (1987). They may recover only for emotional distress they personally experienced. Because the Flaget heirs' NIED claim rests

solely on alleged duties owed to Flaget—and not to them—it fails as a matter of law. We therefore affirm the district court's grant of summary judgment in Mary Russell's favor on the NIED claim.

### E. We award partial attorney fees against the Flaget heirs because their IIED and NIED claims were pursued frivolously.

Mary Russell seeks attorney fees on appeal under Idaho Code section 12-121. This Court may award reasonable attorney fees to the prevailing party upon finding that "the case was brought, pursued or defended frivolously, unreasonably or without foundation." I.C. § 12-121. In evaluating such a request, this Court considers "[t]he entire course of the litigation." *Telford Lands LLC v. Cain*, 154 Idaho 981, 993, 303 P.3d 1237, 1249 (2013). "Apportionment of attorney fees is appropriate for those elements of the case that were frivolous, unreasonable, and without foundation." *Idaho Mil. Hist. Soc'y, Inc. v. Maslen*, 156 Idaho 624, 632, 329 P.3d 1072, 1080 (2014).

Mary Russell contends that this appeal is frivolous and, as a consequence, she is entitled to an award of attorney fees. For the reasons explained below, we agree that the Flaget heirs' appeal of the district court's grant of summary judgment on the IIED and NIED claims was pursued frivolously. At the outset, we acknowledge that awarding attorney fees against a tort plaintiff carries the risk of disincentivizing victims and their heirs from vindicating their compensatory rights, deterring future negligence, and punishing tortfeasors. *See* Thomas D. Rowe, Jr., *Indemnity or Compensation? The Contract with America, Loser-Pays Attorney Fee Shifting, and a One-Way Alternative*, Washburn L.J. 317, 330 (1998). At the same time, we cannot condone litigation that imposes unnecessary costs on defendants and consumes scarce judicial resources by advancing claims that are frivolous, unreasonable, or without foundation.

From the beginning, the Flaget heirs' NIED and IIED claims lacked a sound legal basis. As to the IIED claim, the Flaget heirs unsuccessfully attempted to frame Mary Russell's alleged nonfeasance—failing to warn or protect Flaget—as intentional conduct that is "extreme and outrageous." Worse, the NIED claim relies on Mary Russell's putative breach of a duty she allegedly owed to Flaget rather than to the Flaget heirs personally. In short, the Flaget heirs' pleadings fail to offer anything close to a cognizable NIED or IIED claim. Despite this, the Flaget heirs pursued those claims in the district court and on appeal to this Court. We do not believe the district court's grant of summary judgment to Mary Russell on those claims is fairly debatable. *See C & G, Inc. v. Rule*, 135 Idaho 763, 769, 25 P.3d 76, 82 (2001). By contrast, we find the Flaget heirs' arguments on appeal concerning the district court's treatment of the special-relationship and

18

assumed-duty theories to be more plausible, even if unartfully presented in the briefs and at oral argument.

Therefore, we conclude that the Flaget heirs' appeal of the NIED and IIED claims was pursued frivolously and apportion an award of attorney fees to Mary Russell for the defense against those elements of the case alone.

## IV.    CONCLUSION

Based on the foregoing reasoning and authorities, we affirm the district court's grant of summary judgment in favor of Mary Russell (and AMR) on all claims. We partially award attorney fees against the Flaget heirs and in favor of Mary Russell (and AMR) for the defense of the IIED and NIED claims. Mary Russell (and AMR) is entitled to costs as a matter of course. I.A.R. 40(a).

Chief Justice BEVAN, and Justices MOELLER, ZAHN and MEYER CONCUR.